FILED

2021 Sep-23  PM 12:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| MEGAN GARCIA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No.: 2:18-cv-2079-KOB** |
| | ) | |
| PAMELA CASEY, et al., | ) | |
| | ) | |
| **Defendants** | ) | |

*This document relates to
both cases*

| | | |
|---|---|---|
| VICTOR REVILL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No.: 2:19-cv-114-KOB** |
| | ) | |
| PAMELA CASEY, et al., | ) | |
| | ) | |
| **Defendants** | ) | |

## <u>MEMORANDUM OPINION</u>

These consolidated § 1983 civil rights and defamation cases come before the court on

cross-motions for summary judgment. Plaintiffs Megan Garcia and Victor Revill claim under 42

U.S.C. § 1983 that Deputies Sue Ashworth and Brian Ratliff, as Deputies in the Blount County

Sheriff's Department, unlawfully arrested them in violation of their Fourth Amendment rights to

be free from unreasonable seizures. They also claim that Blount County District Attorney Pamela

Casey and Assistant District Attorney Scott Gilliland violated their constitutional rights by

advising Deputies Ashworth and Ratliff to make the arrests.

At this juncture, every party has filed for summary judgment as to nearly every claim.

The Plaintiffs have moved for summary judgment as to the Fourth Amendment liability of

Deputies Ashworth, (Garcia Doc. 105; Revill Doc. 123),[1] and Ratliff, (Garcia Docs. 124, 125; Revill Doc. 123). Additionally, Ms. Garcia and Mr. Revill request summary judgment on their defamation claims against Ms. Casey and Mr. Gilliland. (Garcia Docs. 124, 125; Revill Doc. 123).

All four Defendants argue in their respective motions for summary judgment that the law entitles them to qualified immunity from suit on the Fourth Amendment violations under the circumstances of this case. Defendants' motions were submitted separately: by Defendants Ashworth and Ratliff against Ms. Garcia, (Garcia Doc. 128), by Defendants Ashworth and Ratliff against Mr. Revill. (Revill Doc. 125), by Defendants Casey and Gilliland against Ms. Garcia (Garcia Doc. 134), and by Defendants Casey and Gilliland against Mr. Revill (Revill Doc. 134). Ms. Casey and Mr. Gilliland also request summary judgment on Mr. Revill and Ms. Garcia's defamation claims on a number of immunity and evidentiary grounds.

In short, the only outlier is that Plaintiffs Garcia and Revill did not move for summary judgment as to Defendants Casey and Gilliland's Fourth Amendment liability for allegedly advising Deputies Ratliff and Ashworth to arrest the Plaintiffs.

For the reasons discussed below and viewing the evidence in the light most favorable to Deputies Ashworth and Ratliff, the court determines as a matter of law that Deputies Ashworth and Ratliff did not have arguable probable cause to arrest Mr. Revill and Ms. Garcia. Because Deputies Ashworth and Ratliff did not have *arguable* probable cause to arrest the Plaintiffs, they did not have *actual* probable cause to arrest the Plaintiffs. So the court will **GRANT** the Plaintiffs' motions for summary judgment as to the liability of Deputies Ashworth and Ratliff for

---

[1] As in its prior Memorandum Opinions in this case, to prevent confusion regarding the two docket sheets for these consolidated cases the court will use "Garcia Doc." to refer to docket entries in the case filed by Megan Garcia, 2:18-CV-2079-KOB, and will use "Revill Doc." to refer to docket entries in the case filed by Victor Revill, 2:19-CV-114-KOB.

unlawful arrest and will **DENY** Deputies Ashworth and Ratliff's motions for summary judgment on the Plaintiffs' unlawful arrest claims based on qualified immunity.

The court also concludes that genuine issues of material fact exist as to the involvement of Ms. Casey and Mr. Gilliland in the arrests of plaintiffs. Viewing the evidence in the light most favorable to the plaintiffs, Ms. Casey and Mr. Gilliland advised Deputy Ashworth to arrest the Plaintiffs when no reasonable prosecutor would have given the same advice under the circumstances. So the court will **DENY** Ms. Casey and Mr. Gilliland's motions for summary judgment on the Plaintiffs' unlawful arrest claims based on qualified immunity.

And finally, genuine issues of material fact exist as to Ms. Garcia and Mr. Revill's defamation claims against Mr. Gilliland and Ms. Casey. So, the court will **DENY** both the Plaintiffs' motions and the DA Defendants' motions as to the defamation claims.

## I.      Factual and Procedural Background

This case concerns an allegedly unlawful arrest that occurred outside the Blount County Courthouse on February 23, 2017. A police officer employed by the City of Oneonta captured the entire arrest on video through his body camera. The parties do not dispute the facts apparent in the body cam video, but they do dispute facts not readily apparent from the video. Accordingly, the court will describe the video and will describe the events occurring outside the video based on the disputed facts of the parties.

### A.      The Arrest Video[2]

On February 23, 2017, Mr. Revill and Ms. Garcia—who are both attorneys—attended a hearing at the Blount County Courthouse in Oneonta, Alabama in representation of their client,

---

[2] The parties filed the arrest video conventionally with the court. (Garcia Doc. 107; Revill Doc. 100). The arrest video is—as of the writing of this Memorandum Opinion—currently available on YouTube at https://www.youtube.com/watch?v=ps2RZ6QOw4M&t=232s.

Mr. Lloyd Edwards. (Garcia Doc. 125-1 at 2). Mr. Edwards's wife had recently filed for a protection-from-abuse order against Mr. Edwards, and Ms. Garcia and Mr. Revill attended the hearing to defend Mr. Edwards in the protection-from-abuse action. (Garcia Doc. 125-1 at 2).

Meanwhile on February 23, 2017, Deputy Sue Ashworth, who worked as an Investigator for the Blount County Sheriff's Department, was investigating Mr. Edwards for alleged possession of child pornography and for alleged sex abuse. (Garcia Doc. 131-3 at 2). Deputy Ashworth suspected that Mr. Edwards had child pornography on his cell phone, so she prepared a warrant to search the person and vehicle of Mr. Edwards for "any and all cellular devices" ("the Edwards search warrant"). (Garcia Doc. 131-3 at 3; Garcia Doc. 105-13 at 2). Deputy Ashworth intended to serve the warrant on Mr. Edwards outside the courthouse after his February 23 hearing. Deputy Ratliff was working security at the courthouse that day; Deputy Ashworth asked for his help in executing the search warrant. (Garcia Doc. 131-3 at 4).

Deputy Ashworth waited outside the courthouse to serve the search warrant on Mr. Edwards. But before Mr. Edwards emerged from the courthouse, Deputy Ashworth received word that Mr. Edwards had handed over two of the three cell phones then in his possession to Mr. Revill, who then gave the two phones to Ms. Garcia.[3] Ms. Garcia placed the phones in her bag. The closed-circuit video footage from the courthouse that day shows Mr. Edwards hand over two of his phones to Mr. Revill and Ms. Garcia. The exchange took place in a common area of the courthouse while other courthouse visitors passed by. (Garcia Docs. 136-22; 131-3 at 4; 125-1 at 4). After Mr. Edwards gave the two phones to Ms. Garcia and Mr. Revill, the three of them exited the courthouse.

---

[3] The parties dispute how Deputy Ashworth learned of the cell phone exchange. The court discusses each party's allegations *infra*.

When the officer's body camera arrest video begins, Mr. Revill, Ms. Garcia, and Mr. Edwards have already exited the courthouse and have been stopped by Deputy Ratliff. Deputy Ashworth then approaches the group and says, apparently to Mr. Revill, "I have a search warrant for that phone [Mr. Edwards] just handed you. I'm from the Sheriff's Office." Mr. Revill then reaches for the Edwards search warrant and says, "Here we go." While Mr. Revill reads the Edwards search warrant, Ms. Garcia cranes her neck, apparently attempting to read it as well. Deputy Ratliff then asks Mr. Edwards whether he has any weapons on his person and informs him that his vehicle is also subject to the search warrant.

Mr. Revill, who is still reading the Edwards search warrant, notices Ms. Garcia begin to open the bag containing the cell phones. Mr. Revill lifts his finger to Ms. Garcia in an apparent "hold on" motion, and Ms. Garcia stops opening the bag.

After reading the warrant, Mr. Revill notes: "The warrant that you all have is for his person and his vehicle;" to which Deputy Ashworth responds, "that's correct." Mr. Revill then says, "he [Mr. Edwards] has given the phone that's on his person." Deputy Ratliff then says to Mr. Revill, "I have video of [Mr. Edwards] handing the phone to you, and you handing the phone to [Ms. Garcia], and it's in that satchel right now." Mr. Revill responds, "you do have that [on video] [unintelligible] . . . but when you came out here and served this search warrant, that was not on his person. So you all are not entitled to that." Mr. Revill then hands the warrant back to Deputy Ashworth.

Deputy Ratliff then says, "we'll go the other route to get that other phone." At that point, Deputy Ashworth answers a phone call and steps out of the frame of the video. She says to the person on the other end of the call, "we've got it on video that he handed his cell phone to his attorney . . . and it's in the satchel that's right here."

5

While Deputy Ashworth is still on the phone call, Mr. Revill asks Deputy Ratliff, "are we being detained?" Deputy Ratliff answers "at this moment in time, I'm going to have to detain you until we determine the next course of action."

Meanwhile, Deputy Ashworth says to the person on the other end of the phone call that "no, they're not denying [taking the phones], we've got it on video." She then reads the Edwards search warrant to the person on the other end of the call and says, "I've got [a warrant for] his person and vehicle." A silence of about twenty seconds passes before Deputy Ashworth approaches Mr. Revill and Ms. Garcia and informs them: "We either need the phone out of the satchel, or we will have to detain you and get a search warrant to get the phone."

Mr. Revill responds, "So you're. . . . Ok. Well, we're not going to give you his . . . we're not going to give you anything that's on our person that you don't have a right to. So if you detain us . . . there are constitutional safeguards to do that, but if you're going to detain us, then detain us. We're not going to run." Mr. Revill then turns to Deputy Ratliff and asks, "So you all are telling us that we are being detained, is that right?" Mr. Ratliff responds in the affirmative.

Meanwhile, Deputy Ashworth turns around and speaks into her phone: "Do what? Say it again." Deputy Ashworth then turns around and tells Ms. Garcia and Mr. Revill, "You both are under arrest for obstructing governmental operations." Mr. Revill remarks, "Obstructing government operations." Deputy Ashworth says, "that's correct."

Mr. Revill then notes, "This is definitely an unlawful arrest, but if we're under arrest, we're under arrest." Deputy Ratliff then pats down Mr. Revill and places both Mr. Revill and Ms. Garcia in handcuffs. While Deputy Ratliff is putting handcuffs on Mr. Revill, Deputy Ashworth says, "We have it on video." Mr. Revill then responds, "We have not broken the law,

so if you're arresting us . . . I'm being arrested for obstruction of government operations?"
Deputy Ashworth responds, "that's correct."

Mr. Revill then says, "Y'all are going to arrest me? Really? For this charge? Are you sure
you want to?" Deputy Ashworth responds, "Are you subject to the law?" To which Mr. Revill
responds, "I am." Deputy Ashworth responds, "Ok. Then you're under arrest." Mr. Revill then
asks for the identities of Deputies Ashworth and Ratliff and asks Deputy Ratliff: "You're
arresting us under her orders?" Mr. Ratliff gestures towards Deputy Ashworth and answers in the
affirmative, "Yes sir."

Deputy Ratliff then begins to leave the scene to go search Mr. Edwards's vehicle
pursuant to the warrant. But before Deputy Ratliff leaves the scene, Mr. Revill stops him and
says, "I want to make sure that you know that our position was that this search warrant . . . was
given to him after he gave us [the phones] to use in his defense. So we did not do anything to
keep you all from doing you all's job. So if you want to take this satchel and go through it, we're
not preventing you from that."

Deputy Ratliff responds, "I understand your point, but understand ours. From the moment
[Mr. Edwards] has entered this courthouse, he's been under surveillance for the purposes of this
warrant. I saw you and [Mr. Edwards] and [Ms. Garcia] get off the elevator . . . you looked up [at
the security camera] two or three times . . . then he handed you the phone and you handed it to
[Ms. Garcia] and she put it in that bag right there. And that is evidence for this search warrant."

Mr. Revill then says, "And you agree that you served this search warrant subsequent to
that. After that. Alright? And wouldn't you agree that we are not preventing you from getting to
[the phones]?" Deputy Ratliff responds, "I mean, we can sit here and split these hairs all day."

About four minutes later, Deputy Ashworth calls someone and requests a transport vehicle for Mr. Revill and Ms. Garcia.

Finally, right before the arrest video ends, Assistant District Attorney Scott Gilliland stands in the courthouse door and states, "Y'all are the ones who are now knowingly in possession of child pornography? That was a bad mistake." At the time Mr. Gilliland uttered those words, the following people were present: Deputy Ratliff; Deputy Ashworth; Mr. Edwards; the Oneonta Police officer whose body camera captured the video; and Mark Staton, an employee of the Blount County District Attorney's Office. (Garcia Doc. 131-3 at 8).

### B.    Disputed Facts Regarding the Arrest

Deputy Ashworth argues that she suspected that Mr. Revill and Ms. Garcia, by taking Mr. Edwards's phones, were "trying to hide the child pornography evidence contained on the phones and elude a *possible* search warrant for the phones." (Garcia Doc. 131-3 at 5). (Emphasis added).

According to Deputy Ashworth, Ms. Garcia attended a February 7, 2017 hearing on a Petition for Dependency filed by Karri Ward, an employee of the Blount County Department of Human Resources. (Garcia Doc. 131-33 at 2). Deputy Ashworth claims that DHR employees informed Ms. Garcia at the February 7 hearing that DHR suspected Mr. Edwards of possessing child pornography on his cell phone. (Garcia Doc. 131-33 at 3–4).

Ms. Garcia denies that anyone told her at the February 7 hearing that DHR suspected Mr. Edwards of possessing child pornography on his cell phone. (Garcia Doc. 151-1 at 3). And Deputy Ashworth *does not* allege that she knew of the events of the February 7 hearing before she served the search warrant on Mr. Edwards at the February 23 hearing. Mr. Revill likewise denies that he knew of child pornography allegations discussed at the February 7 hearing before the February 23 hearing. (Revill Doc. 154-3 at 3). Both Mr. Revill and Ms. Garcia deny any

8

knowledge of a criminal investigation into Mr. Edwards before Deputy Ashworth served the Edwards search warrant. (Revill Doc. 154-3 at 3–4; Garcia Doc. 125-1 at 4).

In any event, Ms. Garcia subpoenaed the DHR file regarding Mr. Edwards. Ms. Karri Ward, a DHR investigator, then brought the file to the February 23 hearing and turned it over to Judge King, the judge who presided over the February 23 hearing. (Garcia Doc. 144-4 at 3). According to Ms. Ward, Judge King turned the DHR file over to Ms. Garcia and Mr. Revill after the hearing; Mr. Revill and Ms. Garcia then left the courtroom with the file. (Garcia Doc. 144-4 at 4). According to Ms. Ward, Mr. Revill and Ms. Garcia were gone with the file "for a bit that seemed like forever;" Ms. Ward texted Deputy Ashworth to let her know that Ms. Garcia and Mr. Revill had the DHR file. (Garcia Doc. 131-3). Deputy Ashworth claims that the DHR file contained evidence indicating that Mr. Edwards viewed child pornography on his cell phone and that she believed that Mr. Revill and Ms. Garcia were reviewing the DHR file. (Garcia Doc. 131-3 at 5).

Ms. Garcia and Mr. Revill claim that they merely had copies of the DHR file made for them after the hearing and did not review its contents; and that neither of them had reviewed the contents of the DHR file even as of May 2021. (Garcia Doc. 125-1 at 3; Revill Doc. 154-3 at 3).

Ms. Ward claims that after Mr. Revill and Ms. Garcia returned with the file, she overheard Mr. Edwards discussing the phones with Mr. Revill and Ms. Garcia, and that one of the attorneys told Mr. Edwards that "law enforcement would likely be coming for [the] phones." (Garcia Doc. 144-4 at 4). Mr. Edwards also testified that Mr. Revill advised him that "there would come a day when the authorities would want to see what was on my phones." (Garcia Doc. 136-17 at 2). The record contains no evidence that Deputy Ashworth learned of this alleged statement before she served the Edwards search warrant.

Mr. Revill and Ms. Garcia both deny giving Mr. Edwards any such advice or otherwise informing him that law enforcement would want the phones. (Revill Doc. 154-3 at 3). Additionally, both Ms. Garcia and Mr. Revill deny any knowledge (1) that a search warrant existed for Mr. Edwards's phones before Deputy Ashworth served the search warrant; and (2) that DHR suspected that Mr. Edwards had child pornography on his phones. (Garcia Doc. 125-1 at 4; Revill Doc. 154-3 at 2–4).

After Ms. Ward overheard this alleged conversation, she proceeded to the courthouse security desk and witnessed the cell phone exchange take place on the security cameras. (Garcia Doc. 144-4 at 5). Deputy Ratliff testified that he also witnessed the exchange on the cameras at the security desk, but he "[does] not recall if anyone was with me at the desk at [that] time." (Garcia Doc. 129-5 at 4).

Mr. Revill and Ms. Garcia claim that they took the phones from Mr. Edwards to retrieve evidence from the phones to use in the defense of Mr. Edwards in the protection from abuse matter. (Garcia Doc. 125-1 at 4).

Before Mr. Revill and Ms. Garcia exited the courthouse, Deputy Ashworth suspected that the attorneys took Mr. Edwards phones to "hide the child pornography evidence contained on the phones and [to] elude a possible search warrant for the phones." She testified that she formed that belief based on the following evidence:

> (a) Mr. Edwards knew he was under investigation for child sexual abuse and had admitted to DHR investigators that he looked at pornography on his phones; (b) the attorneys had likely been informed by Mr. Edwards about the DHR investigation and his admissions of pornography on his phones; (c) the attorneys had just been given the DHR file that included information about child pornography on the phones; and (d) immediately after receiving the file and being given time to review it, the attorneys took possession of the phones.

(Garcia Doc. 131-3 at 5–6).

Deputy Ashworth claims that after she attempted to serve the Edwards search warrant, she called District Attorney Pamela Casey to ask for legal advice as to how to proceed regarding the phones in Ms. Garcia's bag. (Garcia Doc. 131-3 at 6). Deputy Ashworth claims that she spoke to both Ms. Casey and Mr. Gilliland on this call. (Garcia Doc. 131-3 at 6). Deputy Ashworth's cell phone records indicate the existence of four calls between her number and Ms. Casey's cell phone number around and during the time of the arrests. (Garcia Doc. 129-7 at 2).

Deputy Ashworth claims that Ms. Casey first informed her that she would need to get another search warrant for the phones in Ms. Garcia's bag. Ms. Casey confirms that she so advised Deputy Ashworth. (Garcia Doc. 131-3 at 7; 124-8 at 5–6). Additionally, Deputy Ashworth alleges that at some point on one of the calls, Mr. Gilliland and Ms. Casey read her Ala. Code § 13A-10-2, Obstructing Governmental Operations. (Garcia Doc. 131-3 at 7; 124-2 at 11–12). Additionally, Deputy Ashworth testified that she was unfamiliar with the statute under which she arrested Mr. Revill and Ms. Garcia and that she does not believe that she had ever arrested anyone under that statute before she arrested Mr. Revill and Ms. Garcia. (Garcia Doc. 131-3 at 7).

Mr. Gilliland testified that he recalled reading Deputy Ashworth a statute from the Code of Alabama "[s]ometime during the day of February 23, 2017" but that Ms. Casey was not present when Mr. Gilliland read the statute to Deputy Ashworth. (Garcia Doc. 136-2 at 6). Ms. Casey testified that she left the room while Mr. Gilliland was speaking to Deputy Ashworth and that she did not read any statute to Deputy Ashworth. (Garcia Doc. 136-1 at 5).

The parties hotly dispute the identity of the person on the other end of Deputy Ashworth's call immediately before she turned around and placed Mr. Revill and Ms. Garcia under arrest. Deputy Ashworth claims that Ms. Casey advised her to arrest Mr. Revill and Ms.

Garcia for obstruction of governmental operations. (Garcia Doc. 131-3 at 8). Deputy Ashworth testified that Ms. Casey instructed her, "they can't do that. Arrest them." (Garcia Doc. 136-4 at 11, 24). Deputy Ashworth also testified that she made the decision to make the arrests on her own, (Garcia Doc. 136-16 at 85), and did not take Ms. Casey's advice as a command, (Garcia Doc. 136-4 at 24), but that she would not have made the arrest but for Ms. Casey's advice, (Garcia Doc. 136-4 at 11).

Ms. Casey and Mr. Gilliland both deny advising Deputy Ashworth to arrest Mr. Revill and Ms. Garcia. (Garcia Doc. 136-1 at 7; 136-2 at 6). They both deny hearing anyone advise Deputy Ashworth to arrest Mr. Revill and Ms. Garcia. (Garcia Doc. 136-1 at 7; 136-2 at 6). Ms. Casey and Mr. Gilliland both testified that they first learned of Deputy Ashworth's arrests of Mr. Revill and Ms. Garcia *after* Deputy Ashworth made the arrests. (Garcia Doc. 136-1 at 7; 136-2 at 6). Additionally, Mr. Gilliland testified that he informed Ms. Casey about the arrests and that Ms. Casey expressed surprise upon hearing about the arrests. (Garcia Doc. 136-2 at 5).

Mr. Gilliland likewise testified that before he exited the courthouse and made the statement heard in the arrest video, he believed that Deputy Ashworth had made the arrests for possession of child pornography. (Garcia Doc. 136-2 at 4). He testified that he was surprised to see Ms. Garcia under arrest because he knew that she had previously worked as a nanny for some of his family friends and that he was trying to process what he was seeing. (Garcia Doc. 136-2 at 4). He then looked at Ms. Garcia and asked, "Y'all are the ones knowingly in possession of child pornography? That was a bad mistake." (Garcia Doc. 136-2 at 5).

Deputy Ratliff, for his part, testified that before Deputy Ashworth arrested Ms. Garcia and Mr. Revill for obstructing governmental operations, he did not see Mr. Revill or Ms. Garcia do anything that constituted probable cause to arrest them for obstruction of governmental

12

operations. (Garcia Doc. 136-3 at 60–61). He testified that he did not "feel that an arrest was warranted," (Garcia Doc. 136-3 at 61), and that he would not have arrested Mr. Revill and Ms. Garcia. (Garcia Doc. 136-3 at 62). Deputy Ratliff also testified that he did not know who Deputy Ashworth was talking with on the phone, but that it appeared to him that Deputy Ashworth "had received advice and direction to make the arrest from someone on the phone call that [he] was not privy to." (Garcia Doc. 129-5 at 5).

Finally, Mr. Ratliff testified that it "would have been against [his] training to take Deputy Ashworth aside and ask her to reconsider the arrest" and that Deputy Ashworth was his superior that day, (Garcia Doc. 129-5 at 5); but he also testified that he understood that he had a duty to intervene if he thought that Deputy Ashworth's arrests violated Mr. Revill and Ms. Garcia's Fourth Amendment rights. (Garcia Doc. 136-3 at 63).

Mr. Ratliff then transported Mr. Revill to the jail. (Garcia Doc. 129-5 at 6). The record does not indicate how Ms. Garcia arrived at the jail. Later that day, Deputy Ashworth added an additional charge against Mr. Revill and Ms. Garcia for refusal to permit an inspection under Ala. Code § 13A-10-3. (Garcia Doc. 105-21 at 30–31). Deputy Ashworth left the courthouse and obtained arrest warrants for Mr. Revill and Ms. Garcia for the obstruction charge and for the charge of refusal to permit an inspection. (Garcia Docs. 129-18; 129-19). Deputy Ashworth also obtained a search warrant for Ms. Garcia's bag and retrieved Mr. Edwards's two cell phones from the bag. (Garcia Doc. 129-3 at 9).

According to Ms. Casey, either later on February 23 or the next day, Deputy Ashworth told her everything that had happened on the morning of February 23; based on this conversation, Ms. Casey concluded that Deputy Ashworth had probable cause to arrest Mr. Revill and Ms. Garcia for obstructing governmental operations. (Garcia Doc. 136-1 at 6–7).

Additionally, special prosecutor Champ Crocker agreed that probable cause existed to arrest Mr. Revill and Ms. Garcia and agreed to prosecute the case. (Garcia Doc. 136-27 at 3). Mr. Crocker testified that he would not have agreed to prosecute the case if he believed that probable cause did not exist for Deputy Ashworth to arrest Mr. Revill and Ms. Garcia. (Garcia Doc. 136-27 at 3).

On March 17, 2017, an article by reporter Carol Robinson regarding the events of February 23 appeared on AL.com[4] and included the following statements attributed to Ms. Casey:

> Casey on Friday said it is a crime for anyone, even a lawyer, to intentionally prevent a public servant from performing a governmental function or refuse to permit inspection of property that a public servant is legally authorized to inspect.
>
> In this case, she said, officers had a search warrant seeking recovery of any device or devices, including the subject's cell phone or cell phones, which were believed to contain child pornography.
>
> "Within minutes of learning that their client was alleged to have used his cell phone to produce and/or view child pornography, Mr. Revill and Ms. Garcia took possession of their client's phones and attempted to conceal the phones from law enforcement," Casey said. "Such acts are not only illegal, but unethical. Rule 3.4 of the Alabama Rules of Professional Conduct provides that a lawyer shall not 'unlawfully obstruct another party's access to evidence or unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act.'
>
> "My office," Casey said, "will not be intimidated by a lawyer or anyone else who continues to attempt to manipulate the judicial process and/or criminal justice system by public grandstanding."

Carol Robinson, *Lawyers charged with obstruction release body cam footage, request dismissal*, AL.com (Mar. 17, 2017),

https://www.al.com/news/birmingham/2017/03/lawyers_charged_with_obstructi.html.

---

[4] AL.com's owner describes AL.com as "Alabama's #1 media site, making it…Alabama's go-to news and information source[.]" *Alabama Media Group Brands*, ALABAMA MEDIA GROUP (last accessed Aug. 13, 2021), https://www.alabamamediagroup.com/brands/.

Ms. Casey does not recall making these statements to Ms. Robinson. (Garcia Doc. 136-1 at 11–12). Ms. Robinson emailed Ms. Casey before the article went up on AL.com and included in her email to Ms. Casey a press release from Attorney Clayton Tartt—the Plaintiffs' criminal defense attorney at that time—regarding the case. (Garcia Doc. 136-1 at 12). Ms. Robinson asked Ms. Casey for a response to Mr. Tartt's press release. (Garcia Doc. 136-1 at 12). According to Ms. Casey, she made her comments about attorney "grandstanding" in reference to Mr. Tartt. (Garcia Doc. 136-1 at 12).

On March 29, 2018, Circuit Judge Steven D. King of the 41st Judicial Circuit entered a directed verdict of acquittal in the criminal cases against Mr. Revill and Ms. Garcia. (Garcia Doc. 136-16 at 181).

As to Mr. Edwards, the parties dispute whether his phones in fact contained child pornography. Deputy Ashworth sent the phones to the FBI for analysis. Deputy Ashworth testified that the phones "contained many images of child pornography." (Garcia Doc. 129-3 at 9). However, Mr. Edwards has not been charged with any child pornography-related offenses as of the writing of this Memorandum Opinion.

### C.     Procedural Background

For purposes of clarity and to avoid confusion, the court will address the procedural backgrounds of each Plaintiff's case separately.

#### i.      Ms. Garcia

Ms. Garcia filed her original complaint on December 18, 2018. (Garcia Doc. 1). She filed her First Amended Complaint—her current operative complaint—on March 5, 2019. Defendants filed a motion to dismiss. *See* (Garcia Docs. 63; 66). After this court addressed the motion to dismiss, the following claims remained: (1) a Fourth Amendment claim for unlawful arrest under

42 U.S.C. § 1983 against all four Defendants; (2) a defamation claim against Mr. Gilliland; and (3) a defamation claim against Ms. Casey.

Ms. Casey has moved for summary judgment on her unlawful arrest claims against Deputy Ashworth (Garcia Doc. 105-1) and Deputy Ratliff (Garcia Doc. 124-1). She has also moved for summary judgment on her defamation claims against Ms. Casey and Mr. Gilliland. (Garcia Doc. 124-1).

Claiming qualified immunity, Deputies Ashworth and Ratliff have moved for summary judgment against Ms. Garcia on the unlawful arrest claims against them. (Garcia Doc. 143). Also claiming various immunity doctrines, Ms. Casey and Mr. Gilliland have moved for summary judgment on Ms. Garcia's claims against them for unlaw arrest and defamation. (Garcia Doc. 135 at 1–2).

### ii.    Mr. Revill

Mr. Revill filed his complaint on January 18, 2019. (Revill Doc. 1). After the court addressed Defendants' motion to dismiss, the following claims remained: Fourth Amendment claims under § 1983 for unlawful investigatory detention against all Defendants; Fourth Amendment claims under § 1983 for unlawful arrest against all Defendants; a Fourth Amendment claim under § 1983 for false imprisonment against Deputies Ashworth and Ratliff; a Fourth Amendment claim under § 1983 against Ms. Casey and Mr. Gilliland for unlawful detention following arrest; a state-law false imprisonment claim against Ms. Casey and Mr. Gilliland; a defamation claim against Ms. Casey; a defamation claim against Mr. Gilliland; a false light invasion of privacy claim against Ms. Casey and Mr. Gilliland; and a wrongful interference with business relationships claim against Ms. Casey and Mr. Gilliland. *See* (Garcia Docs. 63; 66).

Mr. Revill has moved for summary judgment on his Fourth Amendment unlawful arrest claims against Deputies Ashworth and Ratliff and on his defamation claims against Ms. Casey and Mr. Gilliland. (Revill Doc. 135).

Claiming qualified immunity, Deputies Ashworth and Ratliff have moved for summary judgment on Mr. Revill's Fourth Amendment claims against them. (Revill Doc. 125). Ms. Casey and Mr. Gilliland have moved for summary judgment on Mr. Revill's claims against them for: (1) Fourth Amendment unlawful investigatory detention; (2) Fourth Amendment unlawful arrest; (3) Fourth Amendment unlawful detention following arrest; (4) state-law false imprisonment; (5) defamation; (6) false light invasion of privacy; and (6) wrongful interference with business relationships. (Revill Doc. 135).

The court determines that Mr. Revill did not defend the following claims against the motions for summary judgment filed by Ms. Casey and Mr. Gilliland because he provided no briefing on them: (1) unlawful investigatory detention under the Fourth Amendment; (2) unlawful detention following arrest under the Fourth Amendment; (3) state-law false imprisonment; (4) false light invasion of privacy; and (5) wrongful interference with business relationships. *See* (Revill Doc. 158).

The court also determines that Mr. Revill did not defend the claim of false imprisonment under the Fourth Amendment against Deputies Ashworth and Ratliff. *See* (Revill Doc. 160).

Because Mr. Revill did not defend these claims, the court deems them abandoned and will **GRANT** Ms. Casey and Mr. Gilliland's motions as to Mr. Revill's Counts Two, Six, Nine, Twelve, and Thirteen and will **ENTER SUMMARY JUDGMENT** in favor of Ms. Casey and Mr. Gilliland and against Mr. Revill on those claims. See *Adams v. Bank of Am, N.A.*, 237 F. Supp. 3d 1189, 1203 (N.D. Ala. 2017) ("[a] party that fails to defend a claim that is targeted by a

17

summary judgment motion is deemed to have abandoned that claim") (*citing Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) and collecting cases).  Likewise, the court will **GRANT** Deputy Ratliff and Deputy Ashworth's motions as to Mr. Revill's Count Five and will **ENTER SUMMARY JUDGMENT** in favor of Defendants Ashworth and Ratliff and against Mr. Revill on that claim.

## II. Standards

Because both the Plaintiffs and the Defendants request summary judgment, and because the Defendants request qualified immunity, the court will set out the standards for summary judgment and for qualified immunity.

### A. Summary Judgment

Summary judgment allows a trial court to decide cases that present no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In response, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must

"go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(3)) (emphasis added).

The court must "view the evidence presented through the prism of the substantive evidentiary burden" to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party to defeat the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *Id*. at 255.

Furthermore, the court must view all evidence and inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). After both sides have addressed the motion for summary judgment, the court must grant the motion only if no genuine issues of material fact exist and if the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

The parties in these cases have filed cross-motions for summary judgment. But the filing of cross-motions for summary judgment does not affect the summary judgment standard. *See, e.g.*, *United States v. Oakley*, 744 F.2d 1553, 1555–56 (11th Cir. 1984). And the Eleventh Circuit has clarified that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Oakley*, 744 F.2d at 1555. Instead, "[t]he [c]ourt must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Ala. Mun. Ins. Co. v. Scottsdale Ins. Co.*, 297 F.

Supp. 3d 1248, 1252 (N.D. Ala. 2017) (quoting *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014)).

And finally, "[t]he fact that both parties simultaneously are arguing that there is no genuine issue of fact . . . does not establish that a trial is unnecessary thereby empowering the court to enter judgment at it sees fit." *Citizens Bank & Tr. V. LPS Nat'l Flood, LLC*, 51 F. Supp. 3d 1157, 1168–69 (N.D. Ala. 2014) (quoting *Busby v. JRHBW Realty, Inc.*, 642 F. Supp. 2d 1283, 1289 (N.D. Ala. 2009)). In other words, the court cannot merely rely on the parties' assertions that no factual disputes exist but must decide for *itself* whether genuine issues of material fact exist.

### B.   Qualified Immunity

Qualified immunity protects government officials performing discretionary functions from individual capacity suits *unless* the official violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citation omitted).

"The applicability of qualified immunity is a question of law to be decided by the court." *Willingham v. Loughnan*, 261 F.3d 1178, 1184 (11th Cir. 2001). To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. A two-prong test determines whether qualified immunity is appropriate. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that the *Saucier* analysis may be performed in any order). First, the court asks whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing *Saucier*, 533 U.S. at 201). Second, "[i]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Gonzalez*, 325 F.3d at 1234.

A right is clearly established when "the law at the time of an incident [provided] 'fair warning' to the defendants that their alleged conduct was unconstitutional." *Salvato v. Miley*, 790 F.3d 1286, 1292 (11th Cir. 2015). In the Eleventh Circuit, the court considers only binding precedent to create clearly established law: "holdings of cases drawn from the United States Supreme Court, [the Eleventh Circuit], or the highest court of the state where the events took place." *Gilmore v. Hodges*, 738 F.3d 266, 277 (11th Cir. 2013).

Finally, "[t]hough entitlement to qualified immunity presents a question of law, resolution of this question can sometimes turn on issues of fact. . . . [A] defendant's entitlement to qualified immunity may remain unresolved even into the trial phase of litigation[.]" *Simmons v. Bradshaw*, 879 F.3d 1157, 1163 (11th Cir. 2018). When "a government official moves for summary judgment asserting entitlement to qualified immunity, then the relevant facts are construed in the light most favorable to the non-movant—*i.e.*, the plaintiff—and the court should decide the issue based on those facts." *Simmons*, 879 F.3d at 1163–64. But "[i]f the official's

21

motion does not succeed[,] then his qualified immunity defense remains intact and proceeds to trial. . . . At trial, the court uses the jury's factual findings to render its ultimate legal determination as to whether it would be evident to a reasonable officer, in light of clearly established law, that his conduct was unlawful in the situation he confronted[.]" *Simmons*, 879 F.3d at 1164.

## III.   Analysis

The court will first analyze the Plaintiffs' unlawful arrest claims and the parties' motions for summary judgment on those claims. Then the court will analyze the Plaintiffs' defamation claims and the parties' motions for summary judgment on those claims.

### A.   Unlawful Arrest Claims

No party argues that any of the defendants acted outside of their discretionary authority in making or advising the Plaintiffs' arrests. Accordingly, the court must determine whether a reasonable jury could find that the Defendants violated the Plaintiffs' clearly established constitutional rights in making or advising their arrests.

A law enforcement officer violates a person's Fourth Amendment right against unreasonable seizures if the officer arrests a person without a warrant and without probable cause to make the arrest. U.S. Const. amend. IV; *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1297 (11th Cir. 2018) (citing *Skop v. City of Atlanta*, 485 F.3d 1130, 1143–44 (11th Cir. 2007)). An officer has probable cause to make a warrantless arrest "when an arrest is objectively reasonable under the totality of the circumstances." *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003) (quoting *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003)) (internal quotation marks omitted). An officer makes an objectively reasonable arrest where "the facts and circumstances within the *officer's knowledge*, of which he or she has reasonably

trustworthy information, would cause a prudent person to believe, under the circumstances

shown, that the suspect has committed, is committing, or is about to commit an offense."

*Durruthy*, 351 F.3d at 1088 (quoting *McCormick*, 333 F.3d at 1243) (emphasis in original). And

"[a]lthough probable cause requires more than suspicion, it does not require convincing proof,

and need not reach the same standard of conclusiveness and probability as the facts necessary to

support a conviction." *Durruthy*, 351 F.3d at 1088 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195

(11th Cir. 2002)) (internal quotation marks omitted).

For qualified immunity purposes, however, an officer need only have *arguable* probable

cause to make an arrest. *Cozzi*, 892 F.3d at 1293–94 (citing *Durruthy*, 351 F.3d at 1089).

"Arguable probable cause exists where reasonable officers in the same circumstances and

possessing the same knowledge as the defendant could have believed that probable cause existed

to arrest." *Cozzi*, 892 F.3d at 1294 (quoting *Rushing v. Parker*, 599 F.3d 1263, 1266 (11th Cir.

2010)).

And in the Eleventh Circuit, the law clearly provides that "an arrest made without

arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches

and seizures." *Cozzi*, 892 F.3d at 1297 (quoting *Skop*, 485 F.3d at 1143–44). *See also Moran v.

Cameron*, 362 F. App'x 88, 94 (11th Cir. 2010) ("In wrongful arrest cases, we have defined the

'clearly-established' prong as an 'arguable probable case' inquiry.") (citing *Case v. Eslinger*, 555

F.3d 1317, 1327 (11th Cir. 2009)).

Finally, prosecutors who give legal advice to police officers are entitled only to *qualified*

immunity. The U.S. Supreme Court has stated, "Although the absence of absolute immunity for

the act of giving legal advice may cause prosecutors to consider their advice more carefully,

where an official could be expected to know that his conduct would violate statutory or

constitutional rights, he *should* be made to hesitate." *Burns v. Reed*, 500 U.S. 478, 495 (1991)

(quoting *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985)). Here, the Plaintiffs allege that the DA

Defendants advised the Deputy Defendants to arrest them. Thus, qualified immunity will not

shield the DA Defendants if they advised the Deputy Defendants without arguable probable

cause.

Deputy Ashworth arrested Mr. Revill and Ms. Casey for Obstructing Governmental

Operations under Ala. Code § 13A-10-2. That statute provides:

> (a) A person commits the crime of obstructing governmental operations if, by
> means of intimidation, physical force or interference or by any other independently
> unlawful act, he:
>
> (1) *Intentionally* obstructs, impairs or hinders the administration of law or other
> governmental function; or
>
> (2) *Intentionally* prevents a public servant from performing a governmental
> function.
>
> ***

(Emphasis added).

Alabama Code § 13A-10-1(3) defines a "governmental function" as "[a]ny activity which

a public servant is legally authorized to undertake on behalf of a government…" And under Ala.

Code § 13A-2-2(1), "[a] person acts intentionally with respect to a result or to conduct described

by a statute defining an offense [] when his purpose is to cause that result or to engage in that

conduct."

The only relevant "activity" that Deputy Ashworth was "legally authorized to undertake

on behalf of a government" on February 23, 2017 was the execution of the Edwards search

warrant, which authorized the search of the person and vehicle of Lloyd Edwards for cellular

devices. *See* Ala. Code § 13A-10-2. Thus, under the plain language of the obstruction statute, the

24

Defendants are entitled to qualified immunity only if they had arguable probable cause—based on the information within their knowledge at the time of the arrest—that Mr. Revill and Ms. Garcia had *intentionally* obstructed Deputy Ashworth's execution of the Edwards search warrant when they received Mr. Edwards cell phones. *See Cozzi*, 892 F.3d at 1293–94.

The court will separately analyze whether each defendant is entitled to qualified immunity; and, where relevant, whether Mr. Revill and Ms. Garcia are entitled to summary judgment on their Fourth Amendment unlawful arrest claims.

### i. Deputy Ashworth

First, the court analyzes the Plaintiffs' motions for summary judgment by viewing the evidence in the light most favorable to Deputy Ashworth. The court concludes that she did not have arguable probable cause to arrest Mr. Revill and Ms. Garcia as a matter of law.

The statute under which Deputy Ashworth arrested the Plaintiffs prohibits "intentionally" obstructing a government operation. *See* Ala. Code § 13A-10-2. But even when taking the facts in the light most favorable to Deputy Ashworth, she had no factual basis to find arguable probable cause that the Plaintiffs *knew* that the Edwards search warrant existed when they received their clients' cell phones. Deputy Ashworth testified that she had arguable probable cause to arrest the Plaintiffs based on the knowledge she claims she had at the time of the arrests of the following facts:

> (a) Mr. Edwards knew he was under investigation for child sexual abuse and had admitted to DHR investigators that he looked at pornography on his phones; (b) the attorneys had ***likely*** been informed by Mr. Edwards about the DHR investigation and his admissions of pornography on his phones; (c) the attorneys had just been given the DHR file that included information about child pornography on the phones; and (d) immediately after receiving the file and being given time to review it, the attorneys took possession of the phones.

(Garcia Doc. 131-3 at 5–6) (emphasis added).

The court finds that these facts would support nothing more than suspicion on the part of Deputy Ashworth that Mr. Revill and Ms. Garcia took Mr. Edwards's phones to *intentionally* prevent Deputy Ashworth from executing the Edwards search warrant. Ashworth, at most, suspected that the Plaintiffs were aware of an investigation regarding the phones—not that the phones were subject to the outstanding Edwards search warrant. But mere suspicion that the Plaintiffs knew about the Edwards search warrant does not support probable cause that they intentionally obstructed the execution of that warrant. *See Durruthy*, 351 F.3d at 1088. And because the Eleventh Circuit has clearly stated that suspicion does not support probable cause, a reasonable officer "could [not] have believed that probable cause existed to arrest." *Cozzi*, 892 F.3d at 1294.

The court finds that none of the "facts" Deputy Ashworth testified to knowing at the time of the arrest indicated that the Plaintiffs actually *knew* about the Edwards search warrant that Deputy Ashworth was about to execute. Without knowing that the Edwards search warrant existed, the Plaintiffs could not have *intentionally* obstructed Deputy Ashworth's execution of the warrant by receiving from their client cell phones expected to have evidence helpful to refute the claims in his protection-from-abuse case. Ashworth only assumed that the Plaintiffs knew of a search warrant based on conversations with Edwards and the DHR file. And even if Plaintiffs told Mr. Edwards that law enforcement would "likely be coming" for the phones—a disputed fact—Deputy Ashworth produced no evidence that she knew of this statement before she served the Edwards search warrant. Indeed, Deputy Ashworth herself testified that she "*believed* [the Plaintiffs] were trying to hide the child pornography evidence contained on the phones and elude a *possible* search warrant for the phones." (Garcia Doc. 131-3 at 5) (emphasis added). No reasonable officer would find probable cause to arrest Mr. Revill and Ms. Garcia for

26

*intentionally* obstructing the execution of the Edwards search warrant when that officer "believed"—based only on assumptions without support—that Mr. Revill and Ms. Garcia were trying to elude a *possible* future search warrant.

The Plaintiffs' alleged knowledge of Mr. Edwards's DHR file does not change this conclusion. The Defendants argue that Ms. Garcia knew as early as February 7—sixteen days before the arrest—about a possible DHR investigation into child pornography on Mr. Edwards's phone. (Garcia Doc. 131-33 at 3–4). The Defendants also argue that both Plaintiffs viewed Edwards's DHR file shortly before they received the phones, as the file was being copied. (Garcia Doc. 131-3 at 5).

As an initial matter, Mr. Revill and Ms. Garcia dispute these facts, so they do not weigh in Ms. Ashworth's favor for qualified immunity purposes. But even taking these facts as true, Ashworth's argument fails for several reasons. First, Deputy Ashworth does not allege that she knew about the February 7 hearing before serving the Edwards search warrant on February 23. The alleged revelations of child pornography on Mr. Edwards's phone at the February 7 hearing thus could not inform Ashworth's probable cause inquiry on February 23. Second, Deputy Ashworth presents no evidence that the DHR file actually mentions the Edwards search warrant, nor does she argue that she believed the DHR file mentioned the warrant when she arrested the Plaintiffs. Rather, she argues merely that the file discussed child pornography on the phones. But even if the Plaintiffs had read the file and the file discussed child pornography, those facts would only show, at most, exactly what one of the Plaintiffs is alleged to have said in the courthouse that day—that "law enforcement would *likely* be coming for [the] phones." (Garcia Doc. 144-4 at 4) (emphasis added). Savvy as the Plaintiffs may be, no person could glean knowledge of the Edwards search warrant from DHR documents that do not mention it. Thus, no reasonable

officer would find arguable probable cause that the Plaintiffs intentionally interfered with the Edwards warrant's execution based on the Plaintiffs' merely receiving the DHR documents on February 23.

Additionally, and importantly, the cell phone exchange took place in a *public place*: the lobby of the courthouse in full view of both security cameras and passersby. No reasonable officer would believe that Mr. Revill and Ms. Garcia were attempting to conceal evidence and elude a *known* search warrant in plain view of the public at large. In fact, as Deputy Ratliff noted in the arrest video, Mr. Revill knew the security camera was there: Mr. Revill glanced up at the security camera (or at least looked in the direction of the security camera) several times. It defies the very concept of "reasonableness" that an *attorney* would break the law in plain view of a security camera.

Deputy Ashworth also argues that Mr. Revill's use of the words "here we go" when he took the Edwards search warrant supported her belief that Mr. Revill knew of the search warrant at the time he took Mr. Edwards's phones. But Mr. Revill's utterance would not lead a *reasonable officer* to that belief. Those words could mean anything: Mr. Revill could have used them as a way of asking Deputy Ashworth for the Edwards search warrant, for instance. But in any event, those words are not strong enough to support a finding of *arguable probable cause* to arrest the Plaintiffs.

Further, the court finds that the facts known to Deputy Ashworth did not give rise to arguable probable cause that the Plaintiffs acted "by means of intimidation, physical force or interference or by any other independently unlawful act." *See* Ala. Code § 13A-10-2. As explained above, the Plaintiffs did not know of the Edwards search warrant, so receiving the cell phones from Mr. Edwards did not "interfere" with the execution of the warrant. To be sure, the

Plaintiffs refused to willingly hand over the phones when Deputy Ashworth attempted to warrantlessly search Ms. Garcia's bag. But the Plaintiffs stated on video that they were "not going to run," and that, "if you want to take this satchel and go through it, we're not preventing you from doing that." (Garcia Doc. 107). The court finds no "intimidation, physical force, or interference" in these statements or the behavior that accompanied them. *See* Ala. Code § 13A-10-2. Although Plaintiffs refused to consent to the warrantless search of Ms. Garcia's bag, they were willing to let it proceed.

Nor was the Plaintiffs' refusal to consent to the search an "independently unlawful act." *See* Ala. Code § 13A-10-2. As this court pointed out at the motion to dismiss stage, Mr. Revill and Ms. Garcia's refusal to consent to a search of Ms. Garcia's bag—pursuant to a warrant neither addressed to her nor including her bag—could not have given Deputy Ashworth probable cause to arrest Mr. Revill and Ms. Garcia. *See* (Garcia Doc. 63 at 19–21). In fact, the Eleventh Circuit has pointed out that the refusal to consent to a search does not give probable cause to *search*, let alone arrest. "A contrary rule," the Court held, "would vitiate the protections of the Fourth Amendment." *United States v. Alexander*, 835 F.2d 1406, 1409 n.3 (11th Cir. 1998). And of course, the Plaintiffs argue that they had an entirely legitimate reason for receiving the phones—building their client's case in the protection-from-abuse proceeding. (Garcia Doc. 125-1 at 4).

The court now addresses Deputy Ashworth's most critical argument—that she had arguable probable cause to arrest Mr. Revill and Ms. Garcia because District Attorney Pamela Casey advised Deputy Ashworth to make the arrests. For purposes of Ms. Garcia and Mr. Revill's summary judgment motions, the court will assume that Ms. Casey did so advise Deputy

Ashworth, because that fact would be one consideration on the issue of qualified immunity in

Deputy Ashworth's favor.

The Eleventh Circuit has held—but in an unpublished and nonbinding opinion—that

> it is altogether consistent with a totality of the circumstances analysis to consider pre-arrest consultation and advice of a district attorney as being *one circumstance* contributing to the objective reasonableness of an officer's conduct. Indeed, it may be an important factor for a court to consider when the outcome in the qualified immunity case would *otherwise be unclear.*

*Poulakis v. Rogers*, 341 F. App'x 523, 533 (11th Cir. 2009) (emphasis added).

But as the court explained above, the facts known to Deputy Ashworth *before* she spoke

to Ms. Casey on the phone would not support a finding of arguable probable cause, and the court

did not have much difficulty reaching that conclusion. In other words, the qualified immunity

outcome in this case is *not* "otherwise unclear." *See Poulakis*, 341 F. App'x at 533.

The Eleventh Circuit contemplated an outcome like the court's conclusion in this case

when it noted that "a wave of the prosecutor's wand cannot magically transform an unreasonable

probable cause determination into a reasonable one." *Poulakis*, 341 F. App'x at 533 (quoting

*Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004)). In this case, a reasonable officer would not have

had probable cause to arrest based on Ms. Casey's advice, because that same reasonable officer

would have concluded that probable cause did not exist *before* speaking with Ms. Casey. Even

assuming that Ms. Casey advised Deputy Ashworth to arrest the Plaintiffs, her advice did not

wave a magic wand over Deputy Ashworth's probable cause determination, and the court will

not do so either.

Also troubling is Ms. Casey's testimony—with which Deputy Ashworth agreed—that

Ms. Casey advised Deputy Ashworth to get a new warrant for the phones in Ms. Garcia's bag.

(Garcia Doc. 131-7 at 7; 124-8 at 5–6). Assuming that Ms. Casey *both* advised Deputy Ashworth

to get a warrant *and* to arrest the Plaintiffs, as Deputy Ashworth testified, Ms. Casey's conflicting advice would have led a reasonable officer to question the advice to arrest. Deputy Ashworth's failure to question Casey's advice is especially unreasonable, given Ashworth's testimony that she knew nothing about the statute until she heard it read over the phone. (Garcia Doc. 131-3 at 7). So even assuming that Ms. Casey advised Deputy Ashworth to arrest Mr. Revill and Ms. Garcia, the fact that Deputy Ashworth received conflicting advice about an unfamiliar law does not change—and in fact, bolsters—the court's conclusion that Deputy Ashworth lacked arguable probable cause to arrest the Plaintiffs.

Because Deputy Ashworth did not have arguable probable cause to arrest Mr. Revill and Ms. Garcia, the court will **DENY** Deputy Ashworth's motion for summary judgment on qualified immunity grounds as to Fourth Amendment liability for unlawful arrest. Further, there is no genuine issue of material fact underlying the court's finding of no arguable probable cause—even when viewing the facts in the light most favorable to Deputy Ashworth. Thus, the finding of no arguable probable cause supports a finding of no probable cause for purposes of the Plaintiffs' motions for summary judgment. *See Cozzi*, 892 F.3d at 1297 ("[A]n arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures."). Thus, the court will **GRANT** Mr. Revill and Ms. Garcia's motions for summary judgment as to Deputy Ashworth's Fourth Amendment liability on those same grounds.

### ii.    Deputy Ratliff

No party argues that Deputy Ratliff was the "arresting officer" for purposes of the Fourth Amendment; all parties agree that Deputy Ashworth played that role. Accordingly, Deputy Ratliff is entitled to qualified immunity unless he had a duty either to intervene or not to

participate in Deputy Ashworth's arrests of Mr. Revill and Ms. Garcia. The court concludes—viewing the evidence in the light most favorable to Deputy Ratliff—that he did have a duty either to intervene or not to participate and that he failed to fulfill that duty.

Under the law of the Eleventh Circuit, "a non-arresting officer does not have a duty to investigate the basis of another officer's arrest." *Wilkerson v. Seymour*, 736 F.3d 974, 980 (11th Cir. 2013) (citing *Jones v. Cannon*, 174 F.3d 1271, 1284–86 (11th Cir. 1999)). But "a participant in an arrest, even if not the arresting officer, may be liable if he *knew* the arrest lacked any constitutional basis and yet participated in some way." *Wilkerson*, 736 F.3d at 980 (citing *Jones*, 174 F.3d at 1284–86) (emphasis added).

For the "knowledge" prong of the duty to intervene in an unlawful arrest, the Eleventh Circuit in *Wilkerson* pointed out that the non-arresting officer must possess "the requisite information to put him on notice that an unlawful arrest was occurring or had occurred." 736 F.3d at 980. In *Wilkerson*, for example, the non-arresting officer did not have a duty to intervene in an unlawful arrest because the non-arresting officer arrived on the scene of the arrest after the plaintiff had already been arrested and placed in the back of a squad car; additionally, the arresting officer did not inform the non-arresting officer of all the facts surrounding the arrest. *Wilkerson*, 736 F.3d at 980.

Here, the court first concludes that Deputy Ratliff participated in the arrest. Deputy Ratliff undisputedly (1) handcuffed and patted down Mr. Revill; (2) handcuffed Ms. Garcia; and (3) transported Mr. Revill to the jail. Additionally, Deputy Ratliff stood beside Deputy Ashworth and witnessed the entire sequence of events, including the cell phone exchange and Deputy Ashworth's alleged conversations with Ms. Casey.

Next, the court determines that Deputy Ratliff knew the arrest lacked any constitutional basis. To this point, Deputy Ratliff's own testimony is most telling. He stated that, on February 23, (1) he did not observe Ms. Garcia and Mr. Revill do anything that would have constituted probable cause to arrest them for obstruction of governmental operations; (2) he would not have arrested Mr. Revill and Ms. Garcia; and (3) he did not feel an arrest was warranted. (Garcia Doc. 136-3 at 60–62). And he had sufficient observations on which to base his testimony. Deputy Ratliff observed all the events leading up to the arrest, including the Plaintiffs' taking the cell phones, Deputy Ashworth's serving the Edwards search warrant *after* the phone exchange, and Deputy Ashworth's order to arrest based on the phone call. Deputy Ratliff thus had much more knowledge than the officer in *Wilkerson*, who arrived late to the scene and did not see the events unfold. 736 F.3d at 980.

Deputy Ratliff's observations on February 23 and his testimony thus indicate that he knew the arrests lacked any constitutional basis, yet he still participated in the arrests. He should not have, even if it would have been against his training to ask Deputy Ashworth to reconsider the arrests. In the words of Judge Tjoflat of the Eleventh Circuit, Deputy Ratliff cannot escape liability because "everyone else was doing it!" *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 (11th Cir. 2004). Instead, "all officers, *including those following someone else's lead*, [may] be held liable under § 1983 if they knew or should have known that their conduct might result in a violation of the plaintiff's Fourth Amendment rights." *O'Rourke*, 378 F.3d at 1210 (quoting *Hartsfield v. Lemacks*, 50 F.3d 950, 956 (11th Cir. 1995)) (emphasis added).

Finally, Deputy Ashworth's phone call in which Ms. Casey allegedly ordered an arrest for the Plaintiffs does not redeem Deputy Ratliff's actions. Because he did not inquire about the phone call, Deputy Ratliff could not have known anything about its contents or the speaker on

the other end of the line. Deputy Ashworth could have been speaking to anyone, receiving poor advice to make an arrest without any constitutional grounds. And even though Deputy Ashworth was Deputy Ratliff's superior on February 23, 2017, "the 'just following orders' defense has not occupied a respected position in [the Eleventh Circuit's] jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why [he] should question the validity of that order." *O'Rourke*, 378 F.3d at 1210 n.5 (quoting *Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001)). Given Deputy Ratliff's observation of the day's events and his belief that probable cause did not exist, he should have questioned Deputy Ashworth's order to arrest. Even granting that Deputy Ashworth consulted with Ms. Casey about the arrest, Deputy Ratliff still "knew the arrest lacked any constitutional basis and yet participated." *Wilkerson*, 736 F.3d at 980.

In the end, Deputy Ratliff's own testimony does him in. He admitted that he did not see Mr. Revill or Ms. Garcia do anything that constituted probable cause to arrest them for obstructing government operations. That knowledge triggered a duty to intervene or not to participate under clearly established Eleventh Circuit law. *See Wilkerson*, 736 F.3d at 980. And when Deputy Ashworth ordered the arrest, he unreasonably failed to "question the validity of that order." *O'Rourke*, 378 F.3d at 1210 n.5. Based on these failures, the court will **GRANT** the Plaintiffs' motions for summary judgment as to the § 1983 liability of Deputy Ratliff for unlawful arrest under the Fourth Amendment and will **DENY** Deputy Ratliff's motion for summary judgment.

### iii. Ms. Casey and Mr. Gilliland

DA Defendants Casey and Gilliland move for summary judgment on qualified immunity grounds as to their liability for the Plaintiffs' arrest. Plaintiffs do not move for summary

judgment on this claim. Thus, the court addresses this motion in the light most favorable to the Plaintiffs.

Ms. Casey and Mr. Gilliland dispute their involvement in the Plaintiffs' arrests. On the one hand, Ms. Casey alleges that she only advised Deputy Ashworth to get a search warrant for the phones in Ms. Garcia's bag; Mr. Gilliland alleges that he only read a statute to Deputy Ashworth at some point on February 23, 2017. Both deny any knowledge that Deputy Ashworth was contemplating arresting the Plaintiffs.

On the other hand, Deputy Ashworth testified that Ms. Casey advised her to arrest the Plaintiffs and that Mr. Gilliland was on that call; Deputy Ashworth also testified that Mr. Gilliland and Ms. Casey read her the obstruction statute *before* Deputy Ashworth arrested the Plaintiffs. As support for Deputy Ashworth's view, four phone calls between Ms. Casey and Deputy Ashworth, and the arrest video supports that someone in the District Attorney's office ordered an arrest. This conflicting evidence creates a genuine dispute as to Ms. Casey and Mr. Gilliland's involvement in the arrest, which seals the fate of their request for qualified immunity at this stage.

Even so, the court notes that, by denying any knowledge of Deputy Ashworth's intention to arrest the Plaintiffs, Mr. Gilliland and Ms. Casey tread a dangerous path. Because they deny any involvement in the arrests, they have not presented evidence as to their knowledge regarding probable cause to arrest *at the time they allegedly advised Deputy Ashworth to make the arrests*. Instead, they testify that arguable probable cause existed to arrest Mr. Revill and Ms. Garcia because (1) Ms. Casey later concluded that probable cause existed for Deputy Ashworth's arrests after conversing with Deputy Ashworth later in the day on February 23 or on February 24; and

(2) that Special Prosecutor Champ Crocker later determined that probable cause existed for the arrests.

If the jury later finds that the DA Defendants did advise the arrest, these arguments do not defend that action because the arguable probable cause inquiry focuses on the knowledge of the Defendants *at the time of the arrests*. *See Huebner v. Bradshaw*, 935 F.3d 1183, 1187 (11th Cir. 2019) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The Eleventh Circuit has repeatedly held that "what counts for qualified immunity purposes relating to probable cause to arrest is the information known to the defendant officers or officials *at the time of their conduct*, not the facts known to the plaintiff then or those known to a court later." *Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013) (quoting *Jones v. Cannon*, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999)) (emphasis added).

Further, Mr. Gilliland and Ms. Casey argue that probable cause existed for Deputy Ashworth to *search* Ms. Garcia's bag. According to Ms. Casey and Mr. Gilliland, exigent circumstances existed justifying a warrantless *search* of Ms. Garcia's bag because data contained on cell phones can be erased remotely. (Garcia. Doc. 135 at 30) (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)). But it is not always true that exigent circumstances exist simply because data subject to a warrant resides on a cell phone. *See United States v. Babcock*, 924 F.3d 1180, 1194 (11th Cir. 2019) (examining "whether a reasonable, experienced agent certainly could have believed that [the criminal suspect] would delete any incriminating evidence on his phone before a warrant could be obtained"). Here, the Plaintiffs—attorneys standing on the courthouse steps and bearing ethical duties not to spoliate evidence—showed no signs of destroying the phones or their contents. Rather, the Plaintiffs were willing to let the officers "take this satchel and go through it, we're not preventing you from that." (Garcia Doc. 107;

Revill Doc. 100). Further, the relevant inquiry is not whether Deputy Ashworth had probable cause to *search*; it is whether Mr. Gilliland and Ms. Casey could find that she had arguable probable cause to *arrest* when she arrested the Plaintiffs. The DA Defendants could not.

In sum, viewing the evidence in the light most favorable to the Plaintiffs, Ms. Casey and Mr. Gilliland advised Deputy Ashworth to arrest the Plaintiffs without arguable probable cause to advise the arrests. By denying that they advised Deputy Ashworth to arrest the Plaintiffs, Ms. Casey and Mr. Gilliland merely create a genuine issue of material fact for the jury to determine. So the court will **DENY** Mr. Gilliland and Ms. Casey's motions for summary judgment on the Plaintiffs' § 1983 Fourth Amendment unlawful arrest claims against them. Ms. Casey and Mr. Gilliland are not entitled to qualified immunity at the summary judgment stage considering these factual disputes.

But Ms. Casey and Mr. Gilliland's qualified immunity defenses will "remain[] intact and proceed[] to trial. . . . At trial, the court [will use] the jury's factual findings to render its ultimate legal determination as to whether it would be evident to a reasonable [prosecutor], in light of clearly established law, that his conduct was unlawful in the situation he confronted[.]" *Simmons*, 879 F.3d at 1164.

## B.   Defamation Claims

Ms. Casey and Mr. Gilliland argue that they are entitled to summary judgment on the Plaintiffs' defamation claims on a variety of immunity grounds, including (1) sovereign immunity under Article I, § 14 of the Alabama Constitution; (2) state-agent immunity; (3) absolute privilege; and (4) qualified privilege. They also attack the *prima facie* sufficiency of those claims. The court will address each argument in turn.

### i.   Section 14 Sovereign Immunity

37

Under the Alabama Constitution, "[T]he State of Alabama shall never be made a defendant in any court of law or equity." Art. I, § 14, Ala. Const. 1901. "This immunity applies to claims for damages against not only the State and its agencies, but also State officers and employees who are sued in their *official* capacities (i.e., when the claim is, in effect, against the State). *Meadows v. Shaver*, – So. 3d —, —, 2020 WL 6815066, at *2 (Ala. 2020) (citing *Ex parte Moulton*, 116 So. 3d 1119, 1130–31, 1140 (Ala. 2013)) (emphasis added).

The Plaintiffs sued Mr. Gilliland and Ms. Casey for defamation in their *individual capacities*. But a defendant sued in his individual capacity is still entitled to § 14 sovereign immunity if the plaintiff's claim "is, in effect, one against the State." *Meadows*, – So. 3d at —, 2020 WL 6815066 at *3 (quoting *Barnhart v. Ingalls*, 275 So. 3d 1112, 1122 (Ala. 2018)). To determine whether the plaintiff's claim is "in effect, one against the state," the court must look to "the nature of the action." And "[t]o determine 'nature of the action,' [the court must examine] whether the duties that the [state] officers allegedly breached existed solely because of their official positions." *Meadows*, – So. 3d at —, 2020 WL 6815066 at *3.

Here, however, Ms. Casey and Mr. Gilliland owed duties not to defame Mr. Revill and Ms. Garcia *independent of* their roles as agents of the state. In fact, *everybody* owes a duty to not defame Mr. Revill, Ms. Garcia, or anyone else. Because the duties Ms. Casey and Mr. Gilliland owed not to defame Mr. Revill and Ms. Garcia did not "exist solely because of [Mr. Gilliland and Ms. Casey's] official positions," Mr. Gilliland and Ms. Casey are not entitled to § 14 sovereign immunity on the Plaintiffs' defamation claims. *Meadows*, – So. 3d at —, 2020 WL 6815066 at *3.

Further, the court finds unhelpful Defendants' cited authority—*Birmingham Broadcasting (WVTM-TV) LLC v. Hill*, 303 So. 3d 1148 (Ala. 2020). In that case, the plaintiff

did not challenge—and the court did not address—whether the duty breached existed solely because of the official's position. *See Birmingham Broad.*, 303 So. 3d at 1159. But shortly after deciding *Birmingham Broadcasting*, the Alabama Supreme Court clarified that the key inquiry for sovereign immunity is whether the duty breached existed solely because of the official's position—the very issue *Birmingham Broadcasting* overlooked. *Meadows*, – So. 3d at —, 2020 WL 6815066 at *3. Further, the Court reiterated its "expres[s] overrul[ing]" of all cases failing to address that issue, so *Birmingham Broadcasting* now provides little precedential value. *See id.* Here, this court heeds the Alabama Supreme Court's advice and finds that Ms. Casey and Mr. Gilliland's duty not to defame did not exist solely because of their official position. Thus, they are not entitled to sovereign immunity.

### ii.      State-Agent Immunity

Ms. Casey and Mr. Gilliland also assert that they are entitled to state-agent immunity on the Plaintiffs' defamation claims against them.

Alabama's state-agent immunity bears similarities with federal qualified immunity. But while a defendant raising qualified immunity must first show that he was "acting within the scope of his discretionary authority," *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991), state-agent immunity "simplif[ies] the analysis" by enumerating "certain categories of [s]tate-agent action where agents are immune in the exercise of their judgment." *Ex parte Hudson*, 866 So. 2d 1115, 1117 (Ala. 2003).

The Alabama Supreme Court conveniently created a list of the general categories of functions that qualify for state-agent immunity. *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000). A state agent gains immunity if he is:

(1) formulating plans, policies, or designs; or

> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>> (a) making administrative adjudications;
>> (b) allocating resources;
>> (c) negotiating contracts;
>> (d) hiring, firing, transferring, assigning, or supervising personnel; or
>
> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
>
> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
>
> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

*Ex parte Cranman*, 792 So. 2d at 405.

This list, though non-exhaustive, provides the starting point from which a defendant raising the state-agent defense must begin. *Hollis v. City of Brighton*, 950 So. 2d 300, 307 (Ala. 2006). If a defendant can demonstrate that he engaged in one of these types of functions, "the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Ex parte Estate of Reynolds*, 946 So. 2d at 452. But only *after* the defendant makes such a showing does the burden shift back to the plaintiff.

Mr. Gilliland and Ms. Casey argue that they were acting within the first four *Cranman* categories when they made their allegedly defamatory statements. The court disagrees.

### a.     Mr. Gilliland

Mr. Gilliland testified that he heard that Deputy Ashworth arrested Mr. Revill and Ms. Garcia for possession of child pornography. He then proceeded to the steps of the courthouse, within earshot of several other people, and made a statement that a jury could find constituted an allegation that the Plaintiffs were in knowing possession of child pornography. Such a statement

did not advance *any* interests of the State. He testified that he knew nothing about the case at that

time. He knew only that Deputy Ashworth had arrested Mr. Revill and Ms. Garcia.

The court finds that Mr. Gilliland's statement was not the formulation of any

governmental plan under the first *Cranman* function. It was an off-the-cuff statement that he

made without full knowledge of the circumstances.

Likewise, Mr. Gilliland was not "exercising judgment in the administration of" the DA's

office for purposes of the second *Cranman* function at the time he made the statement. He had no

responsibility or duty to make that statement and accordingly no judgment to exercise in making

the statement. Nor can the statement be said to concern an administrative matter like those

enumerated in *Cranman*. It concerns the substance of alleged criminal acts.

As to the third *Cranman* function, Mr. Gilliland has not produced any statute or rule that

required him to make that statement.

And finally, Mr. Gilliland was not enforcing the criminal laws of the state at the time he

made his statement for purposes of the fourth *Cranman* function; again, he testified that he was

not involved in the arrests and had no knowledge of the facts surrounding them.

> b.    *Ms. Casey*

Ms. Casey's statement to the press likewise did not fall into any of the first four *Cranman*

functions. As to the first, the DA's office had already initiated the prosecution of the Plaintiffs at

the time she made the statement, so the statement she gave reporter Carol Robinson was not her

formulation of any "plan."

As to the second *Cranman* function, the court concludes that Ms. Casey was *not*

exercising judgment in the administration of the DA's office by making the statement. *Cranman*

suggests that the "administration of a department" is limited to management of mundane inter-

41

office items like those listed—budgeting, contracting, hiring, and firing. *Ex parte Cranman*, 792

So. 2d at 405. Ms. Casey's statements do not fit the bill both because the statements addressed

the public, rather than inter-office audiences, and because the content concerned an ongoing

criminal matter, rather than managerial affairs of the type *Cranman* listed.

   As to the third function, Ms. Casey has not presented any statute, rule or regulation that

*imposed* a duty upon her to speak to the press about the case. Ms. Casey raises the National

Prosecutor Standards as a justification for her statements to the media. But those standards

permit—not require—a prosecutor to speak to the media. Nat'l Dist. Att'ys Ass'n, *National*

*Prosecutor Standards* 2-14.5 (3d ed. 2009) ("The prosecutor *may make* a reasonable and fair

reply to comments of defense counsel or others.") (emphasis added); *see also* Am. Bar Ass'n,

*Criminal Justice Standards for the Prosecution Function*, 3-1.10(c) (4th ed. 2017) ("[T]he

prosecutor may make statements that inform the public of the nature and extent of the

prosecutor's or law enforcement actions and serve a legitimate law enforcement purpose.").

Thus, these standards did not impose a duty on her to speak to the media; they merely governed

any statements that she chose to make.

   Finally, Ms. Casey's statement does not fall within the fourth *Cranman* function because

Ms. Casey does not explain how speaking to the press would constitute the "enforcement" of the

criminal laws of the state. Further, at the time of her statements, the Plaintiffs were already

arrested, and the DA's office had already decided to prosecute them.

   Because neither Mr. Gilliland nor Ms. Casey have shown that they made their allegedly

defamatory statements within the scope of their discretionary authority, they are not entitled to

state-agent immunity at the summary judgment stage.

   iii.     **Absolute Privilege**

42

Mr. Gilliland and Ms. Casey argue that Alabama law cloaked their allegedly defamatory statements with an absolute privilege. The Alabama Supreme Court has adopted the Restatement (Second) of Torts standard for absolute privilege:

> A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

*Walker v. Majors*, 496 So. 2d 726, 729 (Ala. 1986) (quoting Restatement (Second) of Torts § 587 (1977)). Absolute privilege preserves the public policy of "secur[ing] the unembarrassed and efficient administration of justice." *O'Barr v. Feist*, 296 So. 2d 152, 157 (Ala. 1974).

But absolute privilege is not as absolute as it may sound. Even statements cloaked in absolute privilege "must not be published outside the circle of those who must have knowledge of them pursuant to the decision-making process. The recipient of a communication made outside the judicial or quasi-judicial proceeding must have a direct or close relationship to that proceeding or the absolute privilege is lost." *Webster v. Byrd*, 494 So. 2d 31, 35 (Ala. 1986). For this reason, the classic examples of absolutely privileged statements are those made "in pleadings, affidavits, or other papers used in the course of the prosecution or defense of an action." *O'Barr*, 296 So. 2d at 157. By contrast, when a clinician allegedly published "throughout the community" a letter that included defamatory evidence in a civil case, he created a jury question as to whether he lost the absolute privilege by that widespread publication. *Borden v. Malone*, – So. 3d —, 2020 WL 6932738, *9 (Ala. Nov. 25, 2020); *see also Webster*, 494 So. 2d at 35.

Here, Mr. Gilliland and Ms. Casey argue that their statements bore "some relation to a judicial criminal proceeding" and are thus absolutely privileged. (Revill Doc. 157 at 25). The court disagrees. Mr. Gilliland's words on the courthouse steps and Ms. Casey's statement to the press fall far outside the classic examples of statements that bear a relation to a proceeding—"pleadings, affidavits, or other papers used in the course of the prosecutions." *O'Barr*, 296 So. 2d at 157. In fact, the DA Defendants do not explain how their public statements advanced the case by serving *any* "legitimate law enforcement purpose." Nat'l Dist. Att'ys Ass'n, *National Prosecutor Standards* 2-14.2 (3d ed. 2009). They are thus irrelevant to the criminal proceeding.

Nor do the statements serve the policy aim of absolute privilege—to secure the "unembarrassed and efficient administration of justice." *O'Barr*, 296 So. 2d at 157. The statements contained no qualifiers indicating that the Plaintiffs' charged acts were merely alleged. This violates ethical standards for prosecutors' public statements. *See, e.g.*, Nat'l Dist. Att'ys Ass'n, *supra*, at 2-14.2 (prohibiting statements that "serve solely to heighten public condemnation of the accused."); Ala. R. Pro. Conduct 3.6(b) (prohibiting public statements expressing "opinion as to the guilt or innocence of a defendant" and requiring "a statement explaining that the charge is merely an accusation"); Am. Bar Ass'n, *Criminal Justice Standards for the Prosecution Function*, 3-1.10(c) (4th ed. 2017) (prohibiting statements that "imply guilt or otherwise prejudice the interest of victims, witness or subjects of an investigation").

But even if absolute privilege applied, the court finds that Mr. Gilliland and Ms. Casey lost that privilege by publishing their statements to persons outside the judicial proceeding. Mr. Gilliland does not dispute that his audience at the courthouse steps included the arresting officers, other nearby officers, and DA employees. These people did not "have a direct or close relationship to [the] proceeding." *Webster*, 494 So. 2d at 35. And Ms. Casey effectively

published her statements "throughout the community" by sharing them with AL.com. *See*

*Borden*, – So. 3d —, 2020 WL 6932738, *9.

Because the DA Defendants' statements were not related to the criminal proceeding and

because the statements were made to audiences beyond those with a direct or close relationship

to the proceeding, absolute privilege does not apply.

### iv.    Qualified Privilege

Mr. Gilliland and Ms. Casey argue that Alabama law entitles them to a qualified privilege

against the Plaintiffs' defamation claims. Again, the court disagrees.

Under Alabama law,

> Where a party makes a communication, and such communication is prompted by
> duty owed either to the public or to a third party, or the communication is one in
> which the party has an interest, and it is made to another having a corresponding
> interest, the communication is privileged. . . . The duty under which the party is
> privileged to make the communication need not be one having the force of legal
> obligation, but it is sufficient if it is . . . moral in its nature. . . .

*Ex parte Blue Cross & Blue Shield of Ala.*, 773 So. 2d 475, 478–79 (Ala. 2000) (quoting *Berry v.*

*City of New York Ins. Co.*, 210 Ala. 369, 371, 98 So. 290 (1923)).

After the defendant establishes that she made the statement pursuant to a "legal" or

"moral" duty owed to the public, the plaintiff can escape the qualified privilege defense by

showing that the defendant made the statement with common-law actual malice (as opposed to

actual malice for the purposes of the First Amendment to the United States Constitution).

*Wiggins v. Mallard*, 905 So. 2d 776, 784 (Ala. 2004). The determination of whether the

defendant made the statement with common-law actual malice falls to the jury. *Wiggins*, 905 So.

2d at 785.

Under Alabama law, a plaintiff can prove common-law actual malice through "evidence

of hostility, rivalry, the violence of the language, the mode and extent of publication, [and also]

by proof of the recklessness of the publication and prior information regarding its falsity."
*Wiggins*, 905 So. 2d at 788 (quoting *Johnson Pub. Co. v. Davis*, 271 Ala. 474, 487, 124 So. 2d
441, 450 (1960)).

> a.   *Mr. Gilliland*

Mr. Gilliland is not entitled to a qualified privilege on the Plaintiffs' defamation claims
against him because he did not have a duty—either legal or moral—to make his statement.
Again, he made his statement off-the-cuff and without full knowledge of the facts surrounding
the situation.

> b.   *Ms. Casey*

The same is true for Ms. Casey. As discussed above regarding state-agent immunity, no
legal or moral duty compelled Ms. Casey to speak to AL.com. The only authority that she relies
on demonstrates this point: "The prosecutor *may* make a reasonable and fair reply to comments
of defense counsel or others." Nat'l Dist. Att'ys Ass'n, *National Prosecutor Standards* 2-14.5
(3d ed. 2009) (emphasis added). And as stated before, Ms. Casey has not offered a "legitimate
law enforcement purpose" for her statement—an ethical prerequisite to any prosecutorial
statements to the press. Nat'l Dist. Att'ys Ass'n, *National Prosecutor Standards* 2-14.2 (3d ed.
2009). Her statements thus fulfilled no legal or moral duty.

But even if Ms. Casey showed a duty to make her statements, the Plaintiffs have
presented enough evidence for a jury to find that she acted with common-law actual malice. For
one thing, Ms. Casey's unqualified accusations to the public are troubling. In Ms. Casey's own
words, "Within minutes of learning that their client was alleged to have used his cell phone to
produce and/or view child pornography, Mr. Revill and Ms. Garcia took possession of their
client's phones and attempted to conceal the phones from law enforcement[.]" Ms. Casey did *not*

state that this statement constituted only her suspicion, that it was merely alleged conduct, or that Mr. Revill and Ms. Casey were innocent until proven guilty. The Plaintiffs, for their part, deny both that they knowingly received child pornography and that they concealed the phones. Ms. Casey thus failed to include a "statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty." Ala. R. Pro. Conduct 3.6(b)(6). While prosecutorial ethics violations do not prove common-law malice, a reasonable jury could discern from these facts "hostility, rivalry . . . [or] recklessness of the publication." *Wiggins*, 905 So. 2d at 788.

Additionally, Ms. Casey accused "a lawyer" of "attempt[ing] to manipulate the judicial process and/or criminal justice system by public grandstanding." Ms. Casey argues that the "grandstanding" statement referred to Clayton Tartt, Mr. Revill's attorney. But there were several attorneys in that case, and Ms. Casey did not specify to whom her "grandstanding" statement referred. Further, the majority of Ms. Casey's press statement discussing the phones and obstructing access to evidence could *only* refer to the Plaintiffs. In this light, a jury could find that the grandstanding comments also referred to Mr. Revill and Ms. Garcia.

Ms. Casey's unqualified accusations against Mr. Revill and Ms. Garcia, coupled with her "grandstanding" comment, could lead a reasonable jury to conclude that she made her statement with hostility towards Mr. Revill and Ms. Garcia. Accordingly, a jury could find that Ms. Casey made her statements with common-law actual malice. So at the summary judgment stage, Ms. Casey is not entitled to a qualified privilege on the Plaintiffs' defamation claims. Her qualified privilege claim remains available, however, for trial.

### *vi.* **Prima Facie** *Sufficiency*

Mr. Gilliland and Ms. Casey both argue that the Plaintiffs have not made out a *prima facie* case of defamation against them. The court disagrees.

To survive summary judgment on a defamation claim under Alabama law, the plaintiff must show "(1) that the defendant was at least negligent, (2) in publishing (3) a false and defamatory statement to another (4) concerning the plaintiff, (5) which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)." *Bell v. Smith*, 281 So. 3d 1247, 1253 (Ala. 2019). In Alabama, spoken statements are defamatory per se where the statement "impute[s] an indictable offense involving infamy or moral turpitude." *Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 345 (Ala. 2007) (quoting *Marion v. Davis*, 217 Ala. 16, 114 So. 357, 55 A.L.R. 171 (1927)).

### a. Mr. Gilliland

Mr. Gilliland's statement constitutes defamation per se because a jury could conclude that he accused plaintiffs of knowingly possessing child pornography. This charge is an indictable offense under Alabama law. *See* Ala. Code § 13A-12-192(a). And as the Plaintiffs point out, few crimes short of murder carry more "infamy" or "moral turpitude" than knowing possession of child pornography. *See Ex parte Felton*, 526 So. 2d 638, 641 (Ala. 1988) ("[C]hild pornography involves, by its nature, mental and sexual abuse, seduction and harmful exploitation of children.") (quoting *State v. Meadows*, 503 N.E.2d 697, 703 (Ohio 1986)). Gilliland's statements thus constitute defamation per se.

Mr. Gilliland first asserts that his statement does not satisfy the "publication" requirement of a *prima facie* defamation claim. To satisfy the "publication" requirement, the plaintiff must show that the defendant communicated "the defamatory matter to *someone other than himself*."

48

*Nelson v. Lapeyrouse Grain Corp.*, 435 So. 2d 1085, 1093 (Ala. 1988) (quoting *K-Mart Corp. v. Pendergrass*, 494 So. 2d 600 (Ala. 1986)). According to Mr. Gilliland, the Plaintiffs have not satisfied the "publication" element because no "civilians" were present when he made the statement (Garcia Doc. 135 at 39); in other words, he argues that "an Assistant District Attorney's question in the presence of law enforcement does not qualify as a publication to an outside third party." (Revill Doc. 157 at 29).

Predictably, Mr. Gilliland does not cite any authority for this proposition because none exists. If law enforcement personnel have somehow lost their status as "persons," the court is not aware of any such determination. Because people other than Mr. Revill and Ms. Garcia were present when Mr. Gilliland made his statement, the Plaintiffs have satisfied the "publication" requirement of their *prima facie* cases.

Mr. Gilliland next argues that his statement was true and therefore not defamatory. But because the Plaintiffs vehemently deny that they knowingly possessed child pornography (and no proof has been presented that they did), a genuine issue of material fact exists as to whether Mr. Gilliland's statement was false.

Because Mr. Gilliland is not entitled to any immunities or privileges based on his allegedly defamatory statement, and because the plaintiffs have made out a *prima facie* case at the summary judgment stage, the court will **DENY** Mr. Gilliland's motion for summary judgment on the Plaintiffs' defamation claims. Likewise, because a genuine issue of material fact exists as to whether Mr. Gilliland's statement was false, the court will **DENY** the Plaintiffs' motions for summary judgment on their defamation claims against Mr. Gilliland.

> *b.*     *Ms. Casey*

Ms. Casey's statements also constituted defamation per se because the very face of her statements accused the Plaintiffs of an indictable offense: she stated that the Plaintiffs' actions were "illegal" and "unethical."

As to her *prima facie* sufficiency arguments, Ms. Casey first alleges that she did not make a defamatory statement "concerning" the Plaintiffs because her "grandstanding" statement referred to Mr. Tartt, not to Mr. Revill or Ms. Garcia. But the court has already determined in the context of Ms. Casey's qualified privilege argument that a jury could find that her statement referred to any of the attorneys in the criminal case—including the Plaintiffs—so this argument fails.

Ms. Casey also argues that her statements were true. Again, however, Mr. Revill and Ms. Casey deny both that they possessed child pornography, *and* they deny that they attempted to conceal the cell phones from law enforcement. Just like with Mr. Gilliland's statement, genuine issues of material fact exist as to the falsity of Ms. Casey's statement.

So, the court will **DENY** Ms. Casey's motion for summary judgment on the Plaintiffs' defamation claims against her and will **DENY** the Plaintiffs' motions for summary judgment on their defamation claims against Ms. Casey.

## IV. Conclusion

For the reasons explained above, the court will **GRANT** Ms. Garcia and Mr. Revill's motions for summary judgment as to the § 1983 Fourth Amendment liability of Deputies Ashworth and Ratliff for unlawful arrest (Garcia Count One as to Ashworth and Ratliff; Revill Count Three). The court will **DENY** the Deputies' motions for summary judgment requesting qualified immunity for their arrests of the Plaintiffs. The court will **ENTER SUMMARY JUDGMENT** in favor of Ms. Garcia and Mr. Revill and against Deputies Ratliff and Ashworth

as to the § 1983 liability of Deputies Ratliff and Ashworth for unlawful arrest in violation of the Fourth Amendment.

The court will **DENY** Ms. Casey and Mr. Gilliland's motions for summary judgment requesting qualified immunity for their alleged unlawful arrests of Plaintiffs in violation of the Fourth Amendment under § 1983 (Garcia Count One as to Casey and Gilliland; Revill Count Four), because a jury could find that Mr. Gilliland and Ms. Casey advised Deputy Ashworth to make the arrests.

The court will **GRANT** Ms. Casey and Mr. Gilliland's motions for summary judgment on Mr. Revill's Counts Two, Six, Nine, Twelve, and Thirteen because Mr. Revill failed to defend these claims and will **ENTER SUMMARY JUDGMENT** in favor of Mr. Gilliland and Ms. Casey and against Mr. Revill on those claims. The court will also **GRANT** Deputy Ashworth and Deputy Ratliff's motions for summary judgment on Mr. Revill's Count Five because Mr. Revill failed to defend this claim and will **ENTER SUMMARY JUDGMENT** in favor of Defendants Ashworth and Ratliff and against Mr. Revill on that claim.

The court will **DENY** both the Plaintiffs' and the Defendants' motions for summary judgment on the defamation claims (Garcia Counts Two and Three; Revill Counts Ten and Eleven) because genuine issues of material fact exist as to the truth of the Defendants' statements.

The court will enter a separate order affecting these rulings. Ms. Garcia's case will proceed to trial on these remaining claims: (1) for Fourth Amendment liability for unlawful arrest as to Defendants Casey and Gilliland; (Garcia Doc. 18, Count One), and (2) for defamation against Defendants Casey and Gilliland (Counts Two and Three).

Mr. Revill's case will proceed to trial on these remaining claims: (1) for Fourth Amendment liability for unlawful arrest as to Defendants Casey and Gilliland; (Revill Doc. 1, Count Four); (2) for Fourth Amendment liability for malicious prosecution as to Defendants Ratliff and Ashworth (Count Seven); and (3) for defamation against Defendants Casey and Gilliland (Counts Ten and Eleven).

**DONE** and **ORDERED** this 23rd day of September, 2021.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE